# EXHIBIT 5



29 May 2025

Secretary Sean Duffy
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Secretary Duffy,

We are writing to you on behalf of the Sikh Coalition, the nation's largest Sikh civil rights organization. Last week, we wrote to you regarding Executive Order 14286, "Enforcing Commonsense Rules of the Road for America's Truck Drivers," (EO 14286), which called for the rescission of the 2016 guidance document titled "English Language Proficiency Testing and Enforcement Policy MC-ECE-2016-006,"[1] and directed you to issue new guidance to the Federal Motor Carrier Safety Administration (FMCSA) outlining revised inspection procedures for ensuring compliance with the federal regulation requiring English language proficiency (ELP) among truck drivers. We write to you again today after reviewing the new guidance[2] you have issued pursuant to EO 14286.

As we emphasized in our first letter, our intention is not to refute the common sense safety need for all drivers to understand a level of English essential to driving in the United States. Indeed, all truck drivers should have already successfully demonstrated their ELP by passing their states' federally-regulated knowledge and skills tests to obtain their Commercial Drivers Licenses (CDLs). Our goal is to reduce the risk of any discrimination against truck drivers who could be profiled for their appearance and subject to disproportionate or discriminatory additional scrutiny during roadside inspections in the name of ELP enforcement.

Per our analysis, we are concerned that the new guidance does not provide sufficient instruction to inspectors to mitigate the risk of national origin or racial discrimination against drivers during ELP enforcement.

**Concerning Omissions and Provisions Within the May 20 Guidance**

**Redaction:** Significant portions of the new guidance and the documents attached to it are redacted, and we respectfully request that unredacted versions of all of these materials be made public immediately. One of the primary policy changes established by the new guidance is

---

[1] See Attachment 1.

[2] "Internal Agency Enforcement Policy, English Language Proficiency Under 49 CFR § 391.11(b)(2)," Department of Transportation Federal Motor Carrier Safety Administration, May 20, 2025, https://www.fmcsa.dot.gov/sites/fmcsa.dot.gov/files/2025-05/FMCSA%20ELP%20Guidance%20with%20Attachments%20Final%20%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%29_Redacted.pdf.



that it directs inspectors to conduct roadside ELP assessments in certain circumstances. However, the sections explaining how inspectors should carry out those ELP assessments are significantly redacted, and the documents attached to the new guidance ("Strategies for Communication with Non-Native Speakers of English and Examples of Driver Interview Questions" and "Highway Traffic Signs Examples") are also almost entirely redacted. Because of the risk of discrimination inherent in ELP assessments, the lack of any established training for ELP assessments for individuals conducting inspections, and the high stakes associated with these assessments—including the potential for drivers to be ordered out-of-service (OOS)—we believe that the public has a significant interest in understanding the redacted instructions that the DOT is providing to inspectors in this guidance.

**Clarification around Roadside Inspector Discretion in Determining When to Administer ELP Assessments:** The only instruction the guidance provides to inspectors on determining whether to initiate an ELP assessment is "[i]f the inspector's initial contact with the driver indicates that the driver may not understand the inspector's initial instructions the inspector should conduct an ELP assessment in order to evaluate the driver's compliance with 49 CFR § 391.11(b)(2)." Under this guidance, it is unclear what information inspectors should rely on to decide that a driver may not understand their instructions. As we explained in our earlier letter, we are concerned that inspectors might single out Sikh and Punjabi drivers for ELP interviews solely because of their articles of faith, skin color, race/ethnicity, because they otherwise 'look' to the inspector like they might not speak English, or because the driver may use mildly or even heavily accented English in their initial interaction with the inspector. Without establishing specific criteria for determining that a driver may not understand an inspector's initial instructions, the new guidance does not sufficiently mitigate this risk.

**Prohibition and Lack of Clarity Regarding Communication Tools:** The new guidance prohibits the use of communication tools such as smartphone applications during driver interviews, and is unclear as to whether such tools may be used during other portions of the roadside inspection. The new guidance does establish that if the inspector determines that the driver is able to respond to official inquiries and understand highway traffic signs and signals, the inspector "may elect to conduct the reminder of the inspection using the communication methods and techniques best suited to facilitate the safe and effective completion of the inspection." But this language leaves the decision of what communication methods and techniques to allow for the remainder of the inspection entirely in the hands of the inspector. For example, if a driver sufficiently demonstrates their ELP during the ELP assessment, and wants to use a communication tool to convey some additional information to the inspector during a later portion of the inspection, it is apparently within the inspector's discretion whether to allow the driver to use that tool. As we explained in our earlier letter, it is critical that drivers are not deterred from using communication tools— particularly for individuals who are in the process of actively strengthening their ELP, or when using these tools might otherwise be helpful for drivers to convey particularly complex information critical to safety or logistics.



**National Office:** 165 Broadway, Office 2359 | New York, NY 10006
t: 212.655.3095 | f: 212.208.4611
**www.sikhcoalition.org**



**Clarification of Consequences:** The new guidance goes beyond instructing inspectors to order drivers OOS by also establishing that inspectors should, "when warranted, [initiate] an action to disqualify the driver from operating commercial motor vehicles in interstate commerce." It is our understanding that disqualifying offenses are established by 49 CFR § 383.51, and that ELP violations are not disqualifying offenses under that regulation. Clarification is needed here to confirm that ELP violations are not disqualifying offenses and to reduce the risk that inspectors wrongfully take action to disqualify drivers for ELP violations.

**Lack of Title VI Requirement:** The new guidance does not include language reminding inspectors of their obligation to conduct roadside inspections, including ELP assessments, in a manner that comports with federal non-discrimination requirements, including the national origin protection under Title VI of the Civil Rights Act of 1965. As we noted in our earlier letter, there is significant risk of discrimination associated with both making discretionary decisions as to which drivers to subject to ELP assessments and in actually conducting those ELP assessments. It is essential that inspectors are reminded that federal law prevents them from relying on drivers' national origin, race, color, or other protected class in making decisions in the course of ELP enforcement.

**Lack of Safety Data:** Finally, we are perplexed that the new guidance does not cite any data that the Department relied upon in determining that it was necessary to establish new ELP enforcement policies. The now-rescinded 2016 policy came about when the Commercial Vehicle Safety Alliance (CVSA) voted to remove English language proficiency as an OOS criteria specifically *because* they could not substantiate the safety impact of ordering drivers OOS for ELP violations. Additionally, per our analysis of FMCSA data, only .19% of all roadside inspection violations between 2021 and 2025 involved a driver's inability to communicate in or understand English.[3] Again, we do not disagree that drivers must be able to communicate in English sufficiently to converse with the public, understand highway signs and signals, and perform other tasks established in 49 CFR 391.11 (b)(2). However, we do respectfully request that the Department clarifies what data or information it relied upon in establishing the new policies laid out in the new guidance, including the requirement that drivers cited for ELP violations be ordered OOS.

### <u>Additional Provisions to Carry Over from the 2016 Guidance to Mitigate the Risk of Discrimination</u>

There were several provisions within the 2016 guidance that we recommended in our earlier letter be included in the new guidance to reduce the risk of discrimination during ELP enforcement activities. Some of those are rendered moot by the above points, but others bear repeating.

**'Sufficient Communication' Guideline:** The 2016 guidance established that if a driver could communicate sufficiently to complete a roadside inspection or investigation, they should not be

---

[3] Roadside Inspection Violations 2021-2015, FMCSA, https://ai.fmcsa.dot.gov/EnforcementPrograms/Inspections?type=AllViolations.



**National Office:** 165 Broadway, Office 2359 | New York, NY 10006
t: 212.655.3095 | f: 212.208.4611
**www.sikhcoalition.org**



cited for an ELP violation. This was a reasonable and sound provision: If a driver can communicate sufficiently during an inspection, it follows that they should not be cited for an inability to communicate.

**Documentation of English Language Training:** Finally, the 2016 guidance established that if a driver was cited for an ELP violation and the employing motor carrier provided information advising that the employee has completed English language training, it should be considered sufficient documentation for addressing this violation. This provision should be reestablished, because it provides a clear, objective process for addressing ELP violations as well as critical recourse for drivers who might be rendered OOS from such violations. In the absence of this provision, drivers will be required to meet unstandardized and discretionary criteria to remedy ELP violations.

## **Additional Recommended Provisions to Add to the New Guidance**

Finally, in our initial letter, we respectfully urged that the Department's new guidance include detailed information on the following items:

**Additional Information about Roadside Interviews:** It is critical that the public have more specific information about the individuals who will be empowered to make ELP judgements of drivers, the training they will receive to make those judgements, and the objective and standardized criteria they will use to make those judgements. In the absence of this information, we are concerned that drivers who do meet the federal ELP requirement could be wrongfully cited for ELP violations and placed OOS simply because they speak with an accent or because an inspector otherwise makes an incorrect discretionary judgment about their ELP. (We recognize that some of this information—specifically the criteria question—may be revealed by sharing the redacted information in the new guidance.)

**Recourse:** The public, and truck drivers and company operators in particular, need to understand the process for recourse available to drivers who are rendered OOS and/or "disqualif[ied]" due to an ELP violation, including but not limited to how to appeal an ELP violation, the authority that will be accountable for responding to those appeals, the timeline within which those appeals will be considered, and the means by why a driver rendered OOS due to an ELP violation can verify their ELP after further study.

As we have said, both before and above, there is no doubt that we must keep our roads safe; this common sense concern applies to Sikh and Punjabi drivers—who continue to make up a sizeable percentage of this workforce critical to our transportation and distribution



**National Office:** 165 Broadway, Office 2359 | New York, NY 10006
t:  212.655.3095  |  f:  212.208.4611
**www.sikhcoalition.org**



infrastructure—as much as it does to any motorist in America. We are equally certain that our nation has a collective interest in maintaining a trucking industry in which all qualified individuals, including drivers, are able to contribute their skills regardless of where they're from or how they look. It is for this reason that we respectfully request that you release an unredacted version of the new guidance and its associated documents, and that you revise the new guidance to address the concerns we have outlined here.

We would welcome the opportunity to meet with you to discuss these issues further, and we thank you for your time and consideration.


Best regards,


Mannirmal Kaur
Senior Federal Policy Manager
The Sikh Coalition

Graham F. West
Managing Director of Policy and Communications
The Sikh Coalition

**National Office:** 165 Broadway, Office 2359 | New York, NY 10006
t: 212.655.3095 | f: 212.208.4611
**www.sikhcoalition.org**



Attachment 1:



U.S. Department
of Transportation

Federal Motor Carrier
Safety Administration

# Memorandum

Subject: **ACTION**: English Language Proficiency Testing and Enforcement Policy MC-ECE-2016-006

Date: JUN 1 5 2016

From: William A. Quade, Associate Administrator for Enforcement

Reply to Attn. of:

To:     All FMCSA Staff

**PURPOSE:**

This policy memorandum provides guidance to Federal Motor Carrier Safety Administration (FMCSA) personnel conducting safety investigations, audits, and inspections of commercial motor vehicles (CMV) and drivers using the Commercial Vehicle Safety Alliance's (CVSA) North American Inspection Standards. This policy removes the requirement to place drivers out of service for English Language Proficiency (ELP) violations and changes the Agency's standard for determining non-compliance with the ELP requirements at 49 CFR § 391.11(b)(2) based on direction from the Office of the Secretary (OST) and the U.S. Depa11ment of Justice (DOJ).

**CANCELLATION:**

This policy memorandum supersedes the policy memoranda issued on this subject titled , " Placing Drivers Out of Service for Violating 49 CFR 391.11(b)(2) English Language Proficiency" dated July 20, 2007, and " 49 CFR Section 391.11(b)(2) English Language Proficiency" dated February 1, 2008.

**BACKGROUND:**

Section 391.11(b)(2) of the Federal Motor Carrier Safety Regulations requires drivers operating CMVs in interstate commerce to " read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries , and to make entries on required reports and records."

Additionally on April 26, 1995 the North American Free Trade Agreement, Land Transpo11ation Standards Subcommittee on Commercial Motor Vehicle and Driver Standards and Motor Carrier Compliance agreed to a resolution on language proficiency of CMV vehicle drivers as follows: "That in recognition of the three countries' language differences it is the responsibility of the driver and the motor carrier to be able to communicate in the country in which the driver /carrier is operating so that safety is not compromised."

CVSA amended its out-of-service (OOS) criteria, effective April 1, 2005, to include violations of 49 CFR Section 391.11(b)(2). In a July 20, 2007 policy memorandum, the Office of Enforcement issued guidance instructing inspectors to cite drivers and/or motor carriers for violations of 49 CFR 391.11(b)(2) when a driver fails to communicate in English sufficiently to understand and res pond to official inquiries and directions, and to place the driver out-of-service . The same memorandum provided guidance and an assessment tool to confirm a driver's ability to communicate English sufficiently to understand and respond to official inquiries and directions.

In a second ELP policy memorandum, effective February 1 2008 FMCSA staff and enforcement personnel were provided a tool specifically for evaluating a drivers ability to understand U.S. highway traffic signs. The 2008



policy allowed the driver to explain his /her understanding of the highway traffic signs in a language other than English, provided the inspector is able to understand the explanation.

Additionally, on October 1, 2014, FMCSA published regulatory guidance titled, "Driver Qualifications; Regulatory Guidance Concerning the Applicability of Language Requirement to Drivers Who Do Not Meet the Hearing Standard' [79 FR 59139]. This guidance explained that the English language rule should not be construed to prohibit operation of a commercial motor vehicle (CMV) by hearing impaired drivers who can read and write in the English language but do not speak for whatever reason, and were granted exemptions by FMCSA. Specifically, the guidance advises that a driver who is granted an exemption from 49 CFR 391.41(b)(11) would not be considered unqualified under the English language proficiency requirement in 49 CFR 391.11(b)(2) if the driver is capable of reading and writing in the English language. In that circumstance, the hearing impaired driver satisfies the English language requirement.

More recently, CVSA members voted to remove 49 CFR 391.11(b)(2) from their out of service criteria because they could not substantiate the safety impact s. This change went into effect on April 1, 2015. As a result FMCSA is formally canceling its policy of citing non-compliance with this regulation as an OOS violation, effective immediately.

In addition, FMCSA Grant Applicants are required to sign the FMCSA Title VI Program Assurance, which includes as authorities Title VI of the Civil Rights Act of 1964 (Title VI) and Executive Order #13166 (Limited English Proficiency or LEP). As a result, FMCSA Recipient- conducted enforcement activities (to include inspection activities) are to be implemented in a non-discriminatory manner that comports with the National Origin protection under Title VI generally and affording reasonable accommodation to LEP drivers specifically.

**POLICY:**

Formal driver interviews to confirm ELP will not be conducted during roadside inspections.

If the driver can communicate sufficiently to complete the inspection or investigation, he/she should not be cited for violations of 391.11(b)(2). If the driver cannot read, write, or speak English but can communicate sufficiently with the inspector/investigator, he/she should not be cited for a violation of 391.11(b)(2).

Tools to facilitate communication such as interpreters, I-Speak cards, cue cards, smart phone applications, and On-Call Telephone Interpretation Service may be used when interacting with drivers. Federal Highway Administration Recipients (primarily State Departments of Transportation) are required to have developed Language Access Plans under their Title VI Programs and may be useful resources to contact regarding available LEP tools and resources. Use of these devices does not constitute a violation of 391.11(b)(2).

If a deaf or hard-of-hearing driver has obtained an exemption from the hearing standard under 49 CFR 391.41(b)(11), the deaf or hard-of-hearing driver satisfies the English language requirement, if they can read and write English sufficiently to communicate.

If a non-English speaking driver acknowledges that he/she does not speak English, the driver should be cited for a violation of Section 391.11(b)(2). However, this is no longer an OOS violation.

This policy does not apply to inspections in Puerto Rico, Guam, the No11hern Mariana Islands or American Samoa, as each of these territories has an official language in addition to English.

If a driver is cited for a violation of the ELP requirements and the employing motor carrier provides information advising that the employee has completed English language training, it should be considered sufficient documentation for addressing this violation.

If during an investigation, there is a pattern of violations discovered and the motor carrier is also identified for prioritization by the Safety Measurement System through an Alert in the Driver Fitness BASIC, enforcement action on these violations may be considered.



**EFFECTIVE DATE:**

This policy is effective immediately. Please share this information with the State Motor Carrier Safety Assistance Program lead agency.

If you have any questions or comments regarding application of this policy, please contact Bill Mahorney, Chief, Enforcement Division, at 202-493-0001 or Bill.Mahorney@dot.gov.